COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-05-252-CR

 

 

JOHN COLUMBUS KUYKENDALL                                            APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

            FROM
THE 415TH DISTRICT COURT OF PARKER COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------








Appellant John Columbus
Kuykendall appeals his conviction for possession of pseudoephedrine, with the
intent to manufacture methamphetamine. 
After the jury found Appellant guilty, the trial court assessed
Appellant=s punishment
at ten years= confinement
and a $2,000 fine. In two points, Appellant contends that the evidence is
legally and factually insufficient to sustain his conviction.  We affirm. 

FACTUAL BACKGROUND








Officer Chris Crawford, a
sergeant with the Weatherford Police Department, responded to a police dispatch
regarding a noise disturbance at a residence in Weatherford.  When he arrived at the location, he saw a
gray truck with the engine running and idling loudly; however, no one was
standing near the truck.  Officer
Crawford heard a noise coming from the screened-in porch[2]
that was attached to the home, and he called out asking if anyone was at
home.  He yelled out numerous times, but
no one responded.  Officer Crawford heard
a shuffling noise that sounded like items being moved around, and he called out
again, AIs there anybody here?@  He went to the back of the
house to knock on the back door, and as he got closer, he walked into an
intense smell of what appeared to him to be anhydrous ammonia coming from the
back porch area.  He acknowledged that he
had never smelled anhydrous ammonia in the past, but he was aware that the odor
is generally associated with methamphetamine labs.  The smell was so intense that it took Officer
Crawford=s breath away.  Officer Crawford
also observed an extension cord and water hose going into the home and a
gasoline can by his feet. 

Because no one at the house
responded to Officer Crawford=s repeated attempts to contact people inside, he called dispatch and
requested a back-up unit to assist him. 
Officer Crawford also contacted Officer Wesley Stout, an investigator
with the Cross Timbers Narcotics Task Force and informed him of what he had
observed.  Officer Stout said that he
would assist Officer Crawford in obtaining a search warrant for the
residence.  Officer Tommy Taylor arrived,
and Officer Crawford briefed him as to what he had observed.








While the officers were
standing outside, Appellant came to the front door of the house.  The officers made contact with Appellant at
that time and saw what appeared to be smoke permeating throughout the living
room area behind Appellant.  Officer
Taylor asked Appellant whether there was anyone else in the house.  Appellant informed the officers that another
person, later identified as Monty Thompson, was there taking a nap.  Because of the intense fumes emitting from
the back of the house, officers asked if they could come inside and check
Thompson=s welfare.  Appellant allowed
the officers into the house.  As
Appellant led the officers into the room where Thompson was apparently sleeping
on the bed, the officers observed two incense candles burning on top of the
television.  The officers spoke with
Thompson, learned that Thompson was the owner of the house, and obtained his
consent to search the premises. 

The officers noticed that
there was water and a bottle of bleach on the bathroom floor, and a strong
smell of bleach was emanating from the bathroom.  Once on the back porch, Officer Crawford
again encountered an extremely intense smell of anhydrous ammonia that caused
him to lose his breath and made his eyes water. 
The smell permeated through the house, and in Officer Crawford=s opinion, no one could be in the house without noticing the smell. 








Officer Crawford spoke with
Appellant outside.  He explained to
Appellant that he was not under arrest and that he was free to leave
anytime.  Appellant informed him that he
understood what was explained to him. 
Officer Crawford asked Appellant what he was cooking, and Appellant told
him he was cooking methamphetamine. 
Officer Crawford testified that he then asked Appellant if he was
attempting a red phosphorous or a Nazi-style cook, and Appellant responded that
he did not know.  Officer Crawford asked
Appellant whether there was any finished product, and Appellant stated that he
did not know what he was doing and that he did not know if there was any
finished product.  Appellant informed
Officer Crawford that he and Thompson were both Acooking the meth.@  Officer Crawford testified
that this was the extent of his conversation with Appellant.  Officer Crawford testified that during his
conversation with Appellant, he did not observe anything about Appellant that
would indicate that the chemicals in the house had an effect on Appellant=s thought process.

Officer Jason Kennedy, an
investigator with the Cross Timbers Narcotics Task Force, arrived at the
location to investigate.  Because of the
strong chemical odor, he wore a respirator mask when he went into the house.  Officer Kennedy testified about the items
found at the house and how the items are utilized in the manufacturing of
methamphetamine.  He acknowledged that
the items that he discussed could be used for general household purposes.  Officer James Peel of the Weatherford Police
Department and the Cross Timbers Narcotics Task Force testified about the
process of manufacturing methamphetamine and described how many of the items
the officers found in the house are used to manufacture methamphetamine.

Officer Kennedy testified
that, with the exception of two buckets that were together with the reacting
liquid in them, most of the items he found in the house were concealed, for
example, behind the dryer and doors.  In
Officer Kennedy=s opinion,
it appeared as though Appellant and Thompson were attempting to destroy the
pseudoephedrine and other items they used in the methamphetamine lab.








In the bathroom, Officer
Kennedy found a trash can that had been overturned as if something had recently
been dumped or washed out of it.  Inside
the back door, the officers found a black bag that had several cans of starter
fluid and a coffee grinder.[3]  The officers sampled the powdery substance
inside the coffee grinder, and put the substance in a plastic bag to submit to
the laboratory for testing.  The
laboratory test results showed that the powdery substance was 0.19 grams of
pseudoephedrine, a precursor to methamphetamine.  The officers did not find any finished
product at the home. 

Appellant testified that
Thompson was a friend of his sister=s.  He testified that he went to
Thompson=s house to find his sister.  He
arrived at Thompson=s house with
only the things in his pocket, his billfold, keys, a pocketknife, and a pair of
scissors.  According to Appellant, when
he arrived at Thompson=s house,
Thompson was surprised to see him; Appellant had only seen him twice before at
another house, but they were not friends. 
Appellant went inside Thompson=s house and spoke with Thompson for a few minutes.








Appellant testified that when
he got up to leave Thompson=s house, Thompson told Appellant that he could not leave until he
helped Thompson Aclean up his
mess.@  According to Appellant, he was
at Thompson=s house for
approximately an hour and a half. 
Appellant smelled a strong odor in the house.  Appellant testified that he helped Thompson,
who walked with a cane, clean out some buckets, but he had no idea what the
buckets contained.  Appellant testified
that none of the items the officers described as being used in the process of
manufacturing methamphetamine belonged to him.








Appellant testified that he
first realized Thompson was involved in manufacturing a chemical when the
officers arrived at the house.  Appellant
stated that he attempted to answer the door to the house for the officers two
or three times, but Thompson would not allow him to.  Appellant remembered that Thompson gave him
four or five different scenarios or stories to tell the police.  Appellant testified that by the time he
answered the door to speak with the officers, the fumes in the house were
strong, and he did not remember the details of his conversation with the
officers because he was in a Afaded-out period at that time.@  He did not remember making the
statement that he was trying to make methamphetamine but he didn=t know what he was doing.  He
testified it was not his intent to help Thompson make methamphetamine; he was
just cleaning up a mess.  Appellant
stated he did not know anything about the pseudoephedrine that officers found
in the coffee grinder.  Further, he did
not recall telling Officer Crawford that he was making methamphetamine, though
he made it clear that he was not saying that he did not tell Officer Crawford
that he was making methamphetamine, just that he did not recall saying that. 

LEGAL AND FACTUAL SUFFICIENCY

Appellant argues that the
evidence is legally and factually insufficient to affirmatively link him to the
0.19 grams of pseudoephedrine residue found in a coffee grinder sitting in an
opaque black tote bag stowed behind a door near the back porch of Thompson=s home.

1. Standard Of Review

In reviewing the legal
sufficiency of the evidence to support a conviction, we view all the evidence
in the light most favorable to the verdict in order to determine whether any
rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.  Jackson v.
Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Hampton v.
State, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).








In reviewing the factual
sufficiency of the evidence to support a conviction, we are to view all the
evidence in a neutral light, favoring neither party.  See Zuniga v. State, 144 S.W.3d 477,
481 (Tex. Crim. App. 2004).  The only
question to be answered in a factual sufficiency review is whether, considering
the evidence in a neutral light, the fact finder was rationally justified in
finding guilt beyond a reasonable doubt. 
Id. at 484.  There are two
ways evidence may be factually insufficient: 
(1) when the evidence supporting the verdict or judgment, considered by
itself, is too weak to support the finding of guilt beyond a reasonable doubt;
or (2) when there is evidence both supporting and contradicting the verdict or
judgment and, weighing all of the evidence, the contrary evidence is so strong
that guilt cannot be proven beyond a reasonable doubt.  Id. at 484-85.  AThis standard acknowledges that evidence of guilt can >preponderate= in favor of
conviction but still be insufficient to prove the elements of the crime beyond
a reasonable doubt.@  Id. at 485.  In other words, evidence supporting a guilty
finding can outweigh the contrary proof but still be insufficient to prove the
elements of an offense beyond a reasonable doubt.  Id. 

In performing a factual
sufficiency review, we are to give deference to the fact finder=s determinations, including determinations involving the credibility
and demeanor of witnesses.  Id. at
481; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for the
fact finder=s.  Zuniga, 144 S.W.3d at 482.  








A proper factual sufficiency
review requires an examination of all the evidence.  Id. at 484, 486-87.  An opinion addressing factual sufficiency
must include a discussion of the most important and relevant evidence that supports
the appellant=s complaint
on appeal.  Sims v. State, 99
S.W.3d 600, 603 (Tex. Crim. App. 2003).

2.  Applicable Law

Health and safety code
section 481.124(a) provides the following:

(a) A
person commits an offense if, with intent to unlawfully manufacture a
controlled substance, the person possesses or transports:

 

(1)
anhydrous ammonia;

(2)
an immediate precursor; or

(3) a chemical precursor or
an additional chemical substance named as a precursor by the director under
Section 481.077(b)(1).

Tex. Health & Safety
Code Ann. ' 481.124(a) (Vernon Supp. 2005). 
The indictment alleges that Appellant, Adid then and there, with intent to unlawfully manufacture a controlled
substance, namely methamphetamine, possess an immediate precursor, to-wit:
pseudoephedrine.@  The jury charge authorized the jury to find
Appellant guilty of the charged offense either as the primary actor or as a
party.

The jury returned a general
verdict finding Appellant guilty of the charged offense.  When a jury returns a general guilty verdict
on an indictment charging alternative theories of committing the same offense,
the verdict stands if the evidence supports any of the theories charged.  Brooks v. State, 990 S.W.2d 278, 283
(Tex. Crim. App.), cert. denied, 528 U.S. 956 (1999).








To prove unlawful possession,
the State must prove that the defendant exercised actual care, custody,
control, or management over the contraband and that he knew the matter
possessed was a contraband.  See Tex. Health & Safety Code Ann. ' 481.002(38) (Vernon Supp. 2005); Poindexter v. State, 153
S.W.3d 402, 405 (Tex. Crim. App. 2005); McQuarters v. State, 58 S.W.3d
250, 259 (Tex. App.CFort Worth
2001, pet. ref=d).  Whether the evidence supporting a conviction
for unlawful possession of a controlled substance is direct or circumstantial,
it must establish, to the requisite level of confidence, that the accused=s connection with the drug was more than just fortuitous under the Aaffirmative links@ rule.  Brown v. State,
911 S.W.2d 744, 747 (Tex. Crim. App. 1995). 









Some relevant factors that
may affirmatively link an accused to contraband include: (1) the defendant=s presence when a search is conducted, (2) whether the contraband was
in plain view, (3) the defendant=s proximity to and the accessibility of the narcotic, (4) whether the
defendant was under the influence of narcotics when arrested, (5) whether the
defendant possessed other contraband or narcotics when arrested, (6) whether
the defendant made incriminating statements when arrested, (7) whether the
defendant attempted to flee, (8) whether the defendant made furtive gestures,
(9) whether there was an odor of contraband, (10) whether other contraband or
drug paraphernalia were present, (11) whether the defendant owned or had the
right to possess the place where the drugs were found, (12) whether the place
where the drugs were found was enclosed, (13) whether the defendant was found
with a large amount of cash, and (14) whether the conduct of the defendant indicated
a consciousness of guilt.  Olivarez v.
State, 171 S.W.3d 283, 291 (Tex. App.CHouston [14th Dist.] 2005, no pet.). 

The first factor weighs
against Appellant because he was present when the search was conducted.  See id.  The second factor weighs in Appellant=s favor because the pseudoephedrine that was found in the house was
not in plain view; rather, it was found in a coffee grinder in a black bag
behind a door.  See id. 








The third factor relates to
Appellant=s proximity
to and the accessability of the narcotic. 
See id.  Appellant was not
in the same room as the pseudoephedrine; when the officers approached
Appellant, he was at the front door and the pseudoephedrine was near the back
of the house.  However, circumstantial
evidence existed to connect Appellant with the contraband before he opened the
door.  Officer Crawford testified that he
heard some shuffling of items on the back porch just before he knocked on the
back door, and he stated that he heard someone open the door.  The bag containing the contraband was found
just inside the back door.  Appellant
testified that he assisted Thompson in cleaning up the house before he answered
the door.  Additionally, Appellant
informed Officers Crawford and Kennedy that he and Thompson were cooking
methamphetamine.  Appellant could not
confirm or deny making the statements; however, he testified that he could not
recall making the statements.  The
truthfulness of Appellant=s statements
is bolstered by the fact that the officers found various chemicals and other
methamphetamine production paraphernalia in the house.  

The evidence also reflected
that Appellant and Thompson were in the process of concealing or destroying the
evidence that indicated they were in the process of manufacturing
methamphetamine.  For example, the trash
can was overturned in the bathtub, the open bleach container indicated that
Appellant and Thompson were attempting to cover up other smells in the
bathroom, and Officer Crawford heard shuffling noises when he approached the
house.  Furthermore, Appellant testified
that he carried buckets from the back porch 
where the contraband was found to the bathroom where Thompson was
scrubbing out the buckets in the bathtub. 
Considering all of this evidence, the third factor weighs against
Appellant because the pseudoephedrine was accessible to him.  See id. 








The fourth factor weighs in
Appellant=s favor
because there was no evidence that Appellant was under the influence of drugs
or narcotics when he was arrested, and Officer Crawford testified that he did
not believe that Appellant was under the influence when they spoke.  See id.  The fifth factor relates to whether Appellant
was in possession of any other contraband when he was arrested.  See id.  There was no evidence that Appellant was in
possession of any other contraband when he was arrested.  The seventh and thirteenth factors also weigh
in Appellant=s favor
because no evidence existed establishing that he attempted to flee the house or
that the officers discovered a large amount of cash at the location.  See id.   

Significantly, though,
Appellant did make some incriminating statements to the officers before his
arrest; thus, the sixth factor weighs strongly against Appellant.  See id.  He informed Officer Crawford that both he and
Thompson were Acooking the
meth.@  When Officer Crawford
questioned him regarding whether he was attempting a Nazi-style or a red
phosphorous method, Appellant responded that he did not know.  Later, Appellant informed Officer Kennedy
that he and Thompson were trying to cook methamphetamine, but they did not know
what they were doing.








The eighth factor relates to
whether Appellant made furtive gestures. 
See id.  While there is no
evidence that Appellant made any furtive gestures in the presence of the
officers, there is ample evidence that he made furtive gestures after the
officers arrived at the scene but before he opened the front door because he
was attempting to destroy the evidence relating to the manufacturing of the
methamphetamine.  By his own admission,
Appellant acknowledged that he was assisting Thompson in cleaning up the
house.  The record also reflects that it
took Appellant some five to ten minutes to open the door to the house, and
during that time Officer Crawford heard shifting noises from inside the house.

The ninth factor relates to
whether there was an odor of contraband at the house.  Id. 
While there was no evidence of an odor of the pseudoephedrine, there
was a strong odor of the anhydrous ammoniaCan item that, along with pseudoephedrine, is utilized in the process
of manufacturing methamphetamine.  The
tenth factor weighs against Appellant.  See
id.  The officers did not find any
finished product or other narcotics at the residence; however, the officers did
find a hypodermic syringe in the plastic tote found on the back porch.  Additionally, officers recovered a vast
amount of paraphernalia relating to the manufacturing of methamphetamine. 

The eleventh affirmative
links factor weighs in favor of Appellant because the record reflects that
Thompson, and not Appellant, was the owner of the house.  See id.  Arguably, the twelfth factor weighs in
Appellant=s favor
because the contraband was discovered in an enclosed area in a coffee grinder
inside a black bag in the house.  See
id. 








Finally, as required by the
fourteenth affirmative links factor, Appellant=s admissions to the officers that he was cooking methamphetamine
indicate a consciousness of guilt that he was attempting to manufacture
methamphetamine, although he admitted that he did not know what he was doing.  See id.  Appellant=s consciousness of guilt is demonstrated by attempts to mask the
strong chemical odors in the house by lighting the incense candles and pouring
bleach in the bathroom.  Additionally,
the fact that the methamphetamine lab was partially cleaned up demonstrates his
consciousness of guilt.  According to the
officers, their observations of the scene led them to believe that the
occupants of the home were trying to hide or disguise the fact that the methamphetamine
lab was present.








Although many of the
affirmative links weigh in Appellant=s favor, certain factors weigh heavily against him.  The fact that Appellant made damaging
admissions that he and Thompson were in the process of making methamphetamine
weighs strongly against him.  Appellant
was unable to confirm or deny these statements, and the fact that he was
attempting to destroy or conceal the evidence that related to the manufacturing
process corroborates those statements. 
It is not the number of affirmative links present that is important, but
rather the Alogical
force@ that they create to prove that the defendant committed the
crime.  Nhem v. State, 129 S.W.3d
696, 699‑700 (Tex. App.CHouston [1st Dist.] 2004, no pet.).

We conclude that the
evidence, when viewed in the light most favorable to the verdict, supports a
determination beyond a reasonable doubt that Appellant was in possession of the
pseudoephedrine and that he had an intent to manufacture methamphetamine.  Additionally, when viewed neutrally, the
evidence is not so obviously weak or so greatly outweighed by contrary proof
that it would not support the finding of guilty beyond a reasonable doubt.  Accordingly, we overrule Appellant=s first and second points. 

CONCLUSION

Having overruled each of
Appellant=s two
points, we affirm the trial court=s judgment.  

 

 

PER CURIAM

 

 

PANEL
F:  HOLMAN, DAUPHINOT, and GARDNER, JJ.

 

DO
NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  JULY 6, 2006











[1]See Tex. R. App. P. 47.4.





[2]The
officers described this area as the Ascreened-in porch,@ the Aback
porch area,@ and
the Aback
room.@  For consistency, we will refer to the area as
the back porch.





[3]The
officers described this item where the pseudoephedrine was found as both a
coffee grinder and a pill grinder.  For
consistency, we will refer to the item as a coffee grinder.